CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 3 0 2008

JOHN F. CORCORAN, CLERK
BY: 
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| ANDRE HUBBARD,<br>　　　　Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| B. CALTON, et al.,<br>　　　　Defendant. | )<br>)<br>) |

Civil Action No. 7:07cv00021

**MEMORANDUM OPINION**

By: Hon. Glen E. Conrad
United States District Judge

Plaintiff Andre Hubbard, a Virginia inmate proceeding pro se, filed this civil rights complaint[1] pursuant to 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343, seeking monetary damages for claims arising out of an incident on July 16, 2005, involving plaintiff and two correctional officers at Wallens Ridge State Prison ("WRSP")[2] in Big Stone Gap, Virginia, where plaintiff is incarcerated. By memorandum opinion and order entered on November 21, 2007, the court denied defendants' motion for summary judgement and referred the case, pursuant to 28 U.S.C. § 636(b)(1)(B), to United States Magistrate Judge Pamela Meade Sargent for an evidentiary hearing and a recommended disposition. The magistrate judge held an evidentiary hearing on February 8, 2008. The case is presently before the court for review of the magistrate judge's report, which recommends that the court find in favor of defendants. Plaintiff has filed objections to the report and recommendation. For the reasons set forth herein, the court will overrule the objections and will adopt the report and recommendation in toto.

---

[1] The original complaint does not include a demand for a jury trial.

[2] WRSP is a facility of the Virginia Department of Corrections ("VDOC"), classified as "Security Level 5, the highest security classification in the VDOC. Its assignment criteria are long-term sentences; single, multiple, and life-plus sentences. An inmate at WRSP must have committed no disruptive behavior for at least 24 months prior to consideration for a transfer to a less-secure facility. See http://www.vadoc.state.va.us/facilities/western/wallens-ridge/default.shtm.

## I.

Plaintiff's complaint alleges excessive force, in violation of the Eighth Amendment, against WRSP Correctional Officers B. Calton ("Calton") and B. McCray ("McCray"). The claim arose out of an incident on Saturday, July 16, 2005, occurring sometime after 4:00 p.m. as a group of inmates, which included plaintiff, were being escorted to the dining hall for the evening meal.[3] As stated in the court's memorandum opinion of November 21, 2007, the facts of this case and the evidence produced in support of the complaint and defendants' motion for summary judgment were such that the court was unable to determine, upon review of the relevant DVD footage of the C recreation yard on the date and time in question, whether Officers Calton and McCray acted appropriately in response to plaintiff's allegedly disruptive behavior in the recreation yard. Accordingly, the court denied defendants' motion for summary judgment and referred the matter to the magistrate judge.

The magistrate judge has issued a report and recommendation, finding the following: defendants used force against plaintiff on July 16, 2005, but the amount of force used was only that force necessary to subdue and control plaintiff; therefore, the amount of force used was not excessive. Accordingly, the magistrate judge recommended that the court find in the defendants' favor on plaintiff's excessive force claim.

---

[3] In its memorandum opinion of November 21, 2007, the court noted that, to the extent the complaint could be construed to state a claim of deliberate indifference to a serious medical need based upon the alleged failure of WRSP medical staff to address purported back and neck injuries subsequent to the incident on July 16, 2005, the claims failed for two reasons. First, the complaint did not allege that either of the two named defendants were involved in plaintiff's medical treatment; generally, a complaint that lacks specific factual allegations concerning a defendant's personal involvement should be dismissed, see Liffiton v. Keuker, 850 F.2d 73, 76 (2d Cir. 1988), and in this case, plaintiff was provided ample opportunities to amend his complaint. Second, plaintiff failed to establish deliberate indifference to a serious medical need because his medical records reveal that, in fact, plaintiff was examined on numerous occasions in response to his complaints of having been injured, including on the day of the incident. See n. 4, mem. op. November 21, 2007.

2

## II.

The magistrate judge makes only a recommendation to this court. <u>Mathews v. Weber</u>, 423 U.S. 261, 270 (1976). The magistrate judge's report has no presumptive weight, and this court retains the responsibility to make a final determination. <u>Id.</u> at 270-271. Consequently, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The court "may also receive further evidence or recommit the matter to the magistrate judge with instructions." <u>Id.</u>

A district court is only required to review <u>de novo</u> those portions of the report to which specific objections have been made. The court need not conduct a <u>de novo</u> review "when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's report." <u>Orpiano v. Johnson</u>, 687 F.2d 44, 47 (4th Cir. 1982).

## III.

As previously stated, plaintiff alleges that Calton and McCray used excessive force against him on July 16, 2005, in violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). To prevail on an excessive force claim, an inmate must establish that prison officials acted with a sufficiently culpable state of mind, and that the harm inflicted on the inmate was sufficiently serious. <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir. 1996). Although there is no requirement that an inmate suffer "serious" or "significant" pain or injury to demonstrate that his harm rises to the level of a constitutional violation, a plaintiff must allege "more than a de

3

minimis pain or injury." Norman v. Taylor, 25 F.3d 1259, 1263 n. 4 (4th Cir. 1994).[4] An inmate

must also satisfy a subjective component by showing that the force was applied "maliciously and

sadistically for the purpose of causing harm" and not "in a good faith effort to maintain or restore

discipline." Whitley v. Albers, 475 U.S. 312, 320-21 (1986); see also Williams, 77 F.3d at 761.

Further, not every malevolent touch by a prison guard amounts to a deprivation of constitutional

rights. See Hudson, 503 U.S. at 9 (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

The magistrate judge's recapitulation of the facts in this case accords with the court's

summary of the facts presented in its memorandum opinion of November 21, 2007. As described

in the report and recommendation, the undisputed evidence indicates that plaintiff, an African-

American, was an inmate at WRSP on July 16, 2005, that he was "housed in the C-6 building or

'pod,'" and that defendants Calton and McCray, "who are white, were working as correctional

officers" at WRSP. At approximately 4:30 p.m., "the inmates housed in the C-6 building were going

to the Dining Hall for their evening meal." As the C-6 inmates, including plaintiff, "left the C-6

building and lined up on the sidewalk crossing the recreation yard, an altercation [unrelated to the

instant complaint] broke out in the Dining Hall" and "[t]he inmates were then ordered to return to

the C-6 building, where they would receive their evening meals." As plaintiff "approached the door

to the C-6 building, Correctional Officer Givens ordered him to exit the line and stand with his face

---

[4] In Norman, the United States Court of Appeals for the Fourth Circuit recognized that "there may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in the impermissible infliction of pain." Norman, 25 F.3d at 1263. In such circumstances, "the force will be 'of a sort repugnant to the conscience of mankind,' and thus expressly outside the de minimis force exception, or the pain itself will be such that it can properly be said to constitute more than de minimis injury." Id. (quoting Hudson, 503 U.S. at 8). In other words, the inmate must show, objectively, that the use of force was contrary to contemporary standards of decency and that he suffered more than de minimis pain or injury. See Hudson, 503 U.S. at 7, 9. Inasmuch as some abuses can leave no lasting physical evidence of injury, the courts recognize that "the objective component can be met by 'the pain itself,' even if the inmate suffers no 'enduring injury.'" Williams, 77 F.3d at 762 (quoting Norman, 25 F.3d 1259, 1264 n. 4).

4

to the wall."[5] After plaintiff "exited the line, Givens ordered [him] to kneel on the ground so that restraints could be placed on his wrists and ankles," and "plaintiff complied with each of these orders."

After summarizing the undisputed facts and evidence, the magistrate judge recounted plaintiff's testimony. According to plaintiff, "after lining up in the recreation yard to enter the Dining Hall on July 16, 2005, a correctional officer with a dog ordered the inmates to return to the C-6 building by saying, 'All ya'll [sic] turn around and go back to the building like cattle.'" In plaintiff's view, "the comment was inappropriate." Plaintiff "testified that he approached Givens and asked for the officer's name and a complaint form so that he could file a complaint against the officer." According to plaintiff, "Givens told him, 'You don't need his name' and 'we don't like people like you who write paperwork.'" Givens then asked plaintiff to step out of the line and stand facing a wall; according to plaintiff, he complied with all of Givens's orders, "including kneeling to be restrained and standing up so that he could be escorted to segregation," and handcuffs were placed on plaintiff's wrists and ankles.

Plaintiff then testified that, as he was being escorted to segregation, Officers Calton and McCray "pushed him down while making racial and threatening comments," and "jumped on [plaintiff] and put their knees in his back and on his neck[,] smashing the side of his face and chin into the concrete sidewalk." Then Officer Porchie ordered Calton and McCray "to stand [plaintiff] up" and, "[a]fter walking a few steps, Porchie told the officers to stop." Plaintiff testified "that a set of leg irons were thrown down out of a control room window, and Porchie had the handcuffs on his ankles replaced with the leg irons." Plaintiff "stated that when Calton and McCray pushed him to

---

[5] Givens is not a defendant in this case. As stated in the magistrate judge's summary of Givens' testimony and recounted elsewhere in this opinion, "Givens testified that he ordered [plaintiff] to exit the line because he intended to charge [plaintiff] with an institutional infraction and have him restrained and taken to segregation."

5

the ground, his hands were cuffed in front of his body. Significantly, [plaintiff] later testified that, as Calton and McCray escorted him to segregation, they kept pushing up on his arms, which he claims were restrained behind his back."

On cross-examination, plaintiff admitted "that he had previously completed two separate grievance forms on July 25, 2005, one of which stated that he was assaulted by five officers, the other which stated that Givens, Porchie, McCray, Calton and two other officers jumped on him."[6] Plaintiff also admitted that, in a letter to prison administrators, he had written that "the officer with the dog had used the word 'niggers' to order the inmates to return to their building." Even though plaintiff did not include this detail in his direct testimony, and repeated on cross-examination that the order was, "Turn around. Go back to your building like cattle," without any mention of a racial epithet, when reminded it of it on cross-examination he maintained that the officer had used this word.[7]

The report and recommendation presented the following summary of plaintiff's cross-examination testimony regarding the injuries plaintiff allegedly received as a result of the incident on July 16, 2005:

> Hubbard claims that he sustained injuries to his back and neck in the incident, including a compression fracture in his L1 vertebrae. Hubbard claims that he has

---

[6] Plaintiff's original contentions, as expressed in the grievance documents, are clearly refuted by the video footage. In his direct testimony, plaintiff attributed a number of statements to the defendants, such as "[s]hut the hell up or we will beat your ass," and "[b]oy, I'll fuck you up," but on cross-examination he conceded that he had not included these allegations in the complaint or in his grievances. On cross-examination, he explained that he "had an inmate help" him write the complaint, and that he "didn't review it thoroughly." Plaintiff conceded that he had "testified to some new things." Additionally, plaintiff submitted a filing to the court on May 30, 2007, stating that "[p]laintiff has never been violent nor had any confrontation with staff or inmates prior to this incident." On cross-examination, plaintiff conceded that this was not true.

[7] Plaintiff was specifically questioned whether Officer Serrac, the canine officer, had used racial epithets, and several times plaintiff testified that he had not. However, when confronted with documents that he has submitted in this case that stated otherwise, he declared that his earlier testimony was incorrect.

6

suffered from chronic back pain since the injury.[8] He also claims that the handcuffs used on his ankles cut his ankles. He claims that his knees and legs were swollen after this incident, and that his ankles and knees have scars on them as a result of the injuries suffered in this incident. Hubbard claims that when a nurse from the medical staff examined him in segregation later that afternoon, the nurse put antibiotic ointment and two adhesive bandages on the cuts on his ankles.[9] Hubbard claims that he also told the nurse that he had hurt his back, but that he was not given any treatment for his back pain.

Officer Jim Serrac testified that he was the correctional officer who was working with the dog on the afternoon of July 16, 2005, and that he ordered plaintiff and the other inmates to return to the C-6 building. According to Serrac, "after being ordered to return to the building, [plaintiff] became disruptive and threatened both him and his dog by saying, 'I can still kick your ass and your dog.'" Serrac testified that Officer Givens was not present when plaintiff uttered this first threat, but that, as the inmates began returning to the C-6 building, Officer Givens came out of the building and heard plaintiff repeat the threat. Serrac testified that Givens then ordered plaintiff to step out of the line so that plaintiff could be charged with threatening Serrac and then be taken to the segregated housing unit ("SHU").

Officer Terry Givens testified that he ordered plaintiff to step out of the line. According to Givens, he accompanied the inmates as they traveled from the C-6 building to the dining hall, and he also walked alongside the inmates as they returned to the C-6 building. Givens testified that he

_____

[8] Regarding statements he had submitted to the court contending that he had no back problems prior to his admission to the VDOC in 2002, plaintiff conceded that the statements were untrue. The record before this court indicates that plaintiff was involved in an automobile accident in May 1991, wherein he sustained several injuries, including injuries to the back. And, as the court discussed in its memorandum opinion referring this matter to the magistrate judge for an evidentiary hearing, the record, supplemented by evidence introduced at the evidentiary hearing, also indicates that plaintiff has suffered a pre-existing compression fracture to the back, sustained in an attempted escape from custody in Campbell County on March 12, 2001, subsequent to which plaintiff pled guilty to felony escape. Plaintiff further conceded that his back was hurt prior to his entry into the VDOC, when he had a construction job.

[9] The court notes that, even though plaintiff testified that the side of his face and his chin had been "smashed" into the sidewalk, and at other times he alleged that officers "plant[ed] their knee[s] in my face," he does not contend, nor does his medical record reflect, that he suffered any injuries to his face.

7

ordered plaintiff to step out of the line because he was being disruptive, and Givens intended to charge plaintiff with an institutional violation for threatening Serrac and the dog. Givens described plaintiff as talking loudly, being verbally abusive, raising his arms, stepping out of line, and as having approached Givens in a threatening manner, demanding a grievance form because he wanted to complain that Serrac had "belittled" him. Givens testified that he ordered plaintiff three times to get in line and stay in line, but that plaintiff did not follow his orders. Givens testified that, although plaintiff followed his orders to step out of line and kneel so that he could be placed in restraints, plaintiff continued to be verbally disruptive.

Sergeant James Porchie testified that, when he arrived at the scene of the incident, plaintiff was fully restrained, kneeling on the ground, and Porchie described plaintiff's conduct as "cussing, swearing, [and] being disruptive." According to Porchie, he ordered Calton and McCray to escort plaintiff to the SHU, and when the officers started to escort plaintiff, it looked as though he tried to pull away from the officers and then leaned toward Officer Calton, whereupon the officers took plaintiff down to the concrete sidewalk. Porchie stated that, on yet another occasion before plaintiff became compliant enough to be taken to segregation, plaintiff was taken down to the ground on the grass. Porchie testified that he never heard any officers make racial or threatening statements to plaintiff. Porchie testifed that plaintiff was wearing leg irons, not handcuffs, and he specifically denied plaintiff's assertion that he had someone throw him a set of leg irons from a control booth so that he could replace the handcuffs on plaintiff's ankles with leg irons.

Officer Calton also testified that, when he arrived at the scene of the incident, plaintiff was in full restraints, wearing leg irons, kneeling, and being "very disruptive." Calton testified that plaintiff "said he would beat Officer, both Officer Serrac's ass and kill the canine dog." He further described plaintiff as disputing that he had done anything wrong and declaring that he would not go

8

to segregation. According to Calton, as he and McCray attempted to escort plaintiff to the SHU, plaintiff "started wriggling" and arguing with the officers that they were "walking too fast," and then plaintiff stopped walking and stated that he refused to walk any farther.

According to Calton, plaintiff then moved toward Calton as though he were attempting to "head-butt" him. Calton testified that he and McCray then took plaintiff down to the concrete sidewalk, where plaintiff continued to be verbally disruptive. Calton stated that he pinned plaintiff to the ground by placing one knee on plaintiff's left shoulder blade and, after plaintiff calmed down, Calton and McCray helped plaintiff to his feet and again attempted to escort him to the SHU. However, plaintiff again became disruptive and again lunged toward Calton in an apparent attempt to "head-butt" him, whereupon Calton and McCray again took plaintiff down to the ground, this time to the grass. Thereafter, upon plaintiff's agreement to be compliant with the officers' orders, they again assisted him to his feet and escorted him, without further incident, to the SHU. Calton specifically denied that he or anyone else made racial or threatening statements to plaintiff. Calton also denied slamming plaintiff's head or chin into the concrete sidewalk and, although he explained that he had placed one knee on plaintiff's left shoulder, he denied that he had placed a knee on plaintiff's neck or lower back. Calton also denied that McCray ever placed his knees on plaintiff's back or neck. In Calton's view, he and McCray used only that amount of force necessary to protect themselves and plaintiff.

Officer McCray testified that, when he and Calton first approached plaintiff that afternoon, plaintiff was behaving aggressively, was cursing, and repeatedly threatened to "kick Serrac's and his dog's asses." McCray described plaintiff as "squirming" when McCray and Calton first stood him up, and he testified that they had to place plaintiff on the ground twice as they were escorting him to the SHU, because plaintiff twice tried to "head-butt" Calton, the second time more forcefully than

9

the first. McCray described plaintiff as having been very aggressive, and maintained that he and Calton used only that amount of force necessary to protect themselves and plaintiff. McCray specifically denied making racial or threatening statements to plaintiff, and he denied hearing any of the other officers make such statements or threats. He testified that he never placed either of his knees on plaintiff's neck or back, and he denied that he or anyone "smashed" plaintiff's chin against the concrete.

Testimony was received from Marsha Stanford, the custodian of inmate records at WRSP. She related that plaintiff's medical records indicate that, upon his transfer to the SHU on July 16, 2005, he was assessed by a nurse who recorded that he complained only of a couple of places on his heels where he had been chafed by the restraints. The records further indicate that ointment and Band Aids were applied to small scratches on plaintiff's heels. The nurse's report does not include any complaint of injury or pain in plaintiff's neck or back. However, Sanford testified that plaintiff's medical records do reflect that he complained on July 18, 2005, of pain in his neck after having been hit in the neck the previous Saturday (July 16, 2005). Plaintiff's medical records indicate that, on July 20, 2005, plaintiff complained that officers had held him down and hurt his neck on July 16, 2005. The medical records indicate that the first complaint plaintiff expressed regarding pain in his back, as opposed to his neck, was on July 21, 2005.

The magistrate judge reviewed the videotape recordings from the incident, and summarized their contents accordingly:

> One of the videotape recordings is of the recreational yard outside of the C-6 building and the other is of the area around one of the entry doors of the C-6 building. On first review, it would appear that these recordings contain little, if any, evidence[] to support either side's version of events. After exhaustive review in court with the parties, and a more thorough review in chambers, it appears that these videotape recordings do show at least two important facts. First, the videotape recording of the recreational yard shows that **only one minute of time elapsed from when Calton**

10

**and McCray first began escorting Hubbard until they resumed escorting him across the yard without incident after taking him down twice.** Second, the videotape recording of the entry door area shows that, as Calton and McCray began escorting Hubbard, **Hubbard's head did indeed turn to the left toward Calton**.

(Emphasis added.)

The magistrate judge determined that, "[g]iven the evidence presented at the hearing," plaintiff "has not met his burden of proof on the subjective component of an excessive force claim." "In making this finding," the magistrate judge "specifically" found

> the officers' version of events more credible than the version of events given by Hubbard. While I find that Calton and McCray did use force on Hubbard on two occasions on July 16, I find that they used only that amount of force necessary to subdue and control Hubbard and to protect Hubbard and themselves. Therefore, I recommend that the court find in the defendants' favor on Hubbard's excessive force claim.

### IV.

Plaintiff has filed a document, titled "Appeal Motion for Objections to findings and Recommendation of Appellant Review," which the court construes as timely filed objections. Although plaintiff's objections are largely "general and conclusory," Orpiano, 687 F.2d at 47, essentially reiterating the arguments in his complaint and at the evidentiary hearing, and therefore lack the requisite specificity, the court, construing plaintiff's filing liberally, nonetheless discerns the following objections.

### A.

Plaintiff objects to the magistrate judge's finding that, although Officers Calton and McCray used force against him, it was not excessive, because the officers used only that amount of force necessary to protect plaintiff and themselves. Plaintiff contends that "Judge Mead [sic] acknowledge [sic] that Plaintiff complied [sic] with each ordered [sic] given by Officer T. Givens there for [sic] there was no need for Officer B. McCray and B. Calton to use any type of force." Plaintiff is

11

incorrect. In the first instance, plaintiff's purported compliance with Officer Givens's orders has no relevance to the question of plaintiff's non-compliant conduct when Officers McCray and Calton attempted to escort him to the SHU. Moreover, the magistrate judge did not find or even acknowledge that plaintiff had complied with "each" order given to him by Officer Givens. The video footage was inconclusive as to this question; therefore, the magistrate judge relied on the weight of the other evidence presented and the credibility of the witnesses, whose version of events she found more credible than plaintiff's. The court has reviewed the 273 page transcript of the evidentiary hearing, and the court agrees with the magistrate judge's assessment of the evidence. The transcript supports the magistrate judge's determination that, while plaintiff has given varying and inconsistent accounts of the events of July 16, 2005, the other witnesses were on the whole consistent and, correspondingly, more credible. Accordingly, this objection is overruled.

**B.**

Plaintiff apparently objects further to the magistrate judge's finding that the amount of force the officers used was warranted under the circumstances. Plaintiff maintains that "[t]he video footage clearly [sic] shows that the officers did have controle [sic] of the situation and there were 'NO' other inmates around to be placed in danger and the video also shows that the Plaintiff 'did' comply with each Order given to him by the Officers!!" Again, plaintiff is mistaken. The video footage is not "clear" as to any issue plaintiff has raised. Before the matter was referred to the magistrate judge for an evidentiary hearing, the video footage was reviewed by this court, and this court determined then that, without further factual development, there was very little clarity provided by the video footage, which was indistinct and recorded at too great a distance to be of much use in determining whether plaintiff had been subjected to excessive force. As the magistrate judge described it, "[o]n first review, it would appear that these recordings contain little, if any, evidence[] to support either side's

12

version of events." However, plaintiff's allegations and the testimony provided at the evidentiary hearing – plaintiff's testimony as well as that of other witnesses – indicates that plaintiff was verbally disruptive. Furthermore, the testimony taken at the evidentiary hearing, and a view of the video footage in light of that testimony, suggests that plaintiff was indeed resistant when being escorted to the SHU. The court agrees that the weight of the evidence supports a finding that plaintiff was not wholly obedient to the officers' orders until after he was subdued the second time. Accordingly, this objection is overruled.

## C.

Plaintiff objects to the magistrate judge's findings as to the credibility of the witnesses. He argues that the magistrate judge "stated that she believe [sic] the word of the officers over the plaintiff and if you review the transcripts you will see each officer involved were [sic] caught in several lies!!"

## 1.

Plaintiff states that, although Officer T. Givens "testifyed [sic] on the stand that [plaintiff] was in line and approached him in a threatening manner," Officer Givens was at first unable to correctly identify plaintiff on the video footage. Apparently, plaintiff views this error, which was corrected by Officer Givens of his own accord, as a "lie." As plaintiff acknowledges, the magistrate judge was at that time reviewing video footage in which plaintiff did not even appear. Regarding the first segment of video shown to him, Givens testified that the video was unclear and, regarding a tentative identification of plaintiff, he stated, "I can't tell 100 percent." Then, he stated that, although he had identified plaintiff, "that will have to be corrected. I made a mistake." Then Officer Givens – not plaintiff, not the magistrate judge, nor anyone else – clarified that the video footage being screened was not the correct sequence, given that it showed inmates returning not to the C-6 pod, but "to Charlie one, two, three side," and plaintiff was not in that group. Accordingly, upon Givens's

13

prompting, the video was forwarded to the correct point and Givens identified himself and plaintiff. This identification was undisputed. Furthermore, plaintiff is incorrect in his assertion that, once the video footage was forwarded to the appropriate time frame, Givens still identified the wrong inmate. Once the footage was forwarded to convey images of the correct group of inmates, there were no further misidentifications by Officer Givens. Accordingly, this objection is overruled.

**2.**

Plaintiff further contends that, once he was identified in the video, there were no signs of his being disruptive. However, it is clear from plaintiff's own complaint that plaintiff stepped out of line and approached Officer Givens, demanding that he be given a grievance form when the entire C-6 unit was being returned to its pod as a result of an institutional lockdown. As Officer Givens testified, "according to policy that Department of Corrections set forth, if you're out of line you're disruptive." Additionally, the transcript indicates that Givens identified sequences in the video footage that indicate that plaintiff was kicking at Officer Givens, thus requiring Givens to hold plaintiff's legs, after Givens had placed him on the ground in leg restraints. Givens also explained that the footage of the entire encounter indicates that, although plaintiff is partly outside of the frame of the image, plaintiff repeatedly turned around and spoke to Officer Givens with some degree of animation. Accordingly, this objection is overruled.

**3.**

Plaintiff states that "Officer[s] Calton and McCray both testifyed [sic] that they used there [sic] knee [sic] and applied pressure to pen [sic] plaintiff to the ground." This is incorrect. Only Officer Calton testified that he applied his knee to plaintiff's left shoulder blade. Plaintiff contends that the video shows him complying with Officer McCray and Calton. Although the video in itself is unclear as to plaintiff's alleged compliance, plaintiff's contention that he was compliant is

14

unsupported by the evidence obtained at the hearing. Plaintiff's contention is further negated by the magistrate judge's observations that the entire encounter between plaintiff and Officers Calton and McCray takes "only one minute," and that plaintiff's "head did indeed turn to the left toward Calton." Although the video is indistinct, it does not at all support plaintiff's account of a rather violent and kinetic incident;[10] however, it does tend to support the other witnesses' account of an attempt on plaintiff's part to "head-butt" Officer Calton, and the officers' subsequent attempts to subdue plaintiff and obtain his compliance. Plaintiff contends that the video "clearly shows both officers with there [sic] knees in [his] back"; however, the video "clearly" indicates no such thing, and it certainly does not indicate an entanglement of the sort plaintiff alleges to have occurred.

### 4.

Plaintiff states that "Judge Mead [sic] failed to notice T. Givens [sic] statement that contradicts itself that he saw plaintiff being disrupted [sic] and raising his arms and being verbally abusive"; in plaintiff's view, "the video contradict [sic] Givens [sic] statement showing Plaintiff walking in a streight [sic] line." Plaintiff adds that this supports his objection on the ground that "each Officer was caught in lies and Judge Pamela Mead [sic] took the Defendants [sic] word over the Plaintiff [sic] word!!" [sic, punct.] As the court has already recounted, Officer Givens misidentified himself and plaintiff on his initial viewing of the videotape, but corrected that misidentification. Officer Givens gave some general testimony regarding his initial encounter with plaintiff, explaining that he "asked [plaintiff] to step out of line" after plaintiff stated that "Officer Serrac was not going to discriminate against" plaintiff, that Officer Serrac was "belittling" plaintiff,

---

[10] To recapitulate, plaintiff alleges that he was frog-marched, thrown to the ground, and his face was "slammed" into concrete. Then he was propped up again and frog-marched a little ways farther, only to be thrown down again, this time onto the grass, all the while being verbally abused, tackled, and kneed in the back by not one but two officers, both of whom weigh "more than two hundred and fifty pounds."

15

and that plaintiff "was going to kill [Officer Serrac] because he was belittling" plaintiff. Officer Givens stated that he had to repeat the command "twice" because plaintiff was "disruptive" and refused to obey orders, in particular refusing two requests "to step in a different direction." Plaintiff requested that Givens describe plaintiff's "disruptive behavior," and Givens replied as follows:

> You were raising your arms up, looking back, you were not in the line with the other inmates, you kept stepping out of line, you were talking loud, looking back toward Officer Serrac on several occasions, running toward me. You came toward me in a threatening manner wanting a grievance form, and I told you to get back away from me; that I would take care of your grievance form when I got you back inside the building.

Once the video footage was forwarded to the correct sequence, Givens identified himself and plaintiff. Givens's testimony suggests that the initial encounter, when plaintiff requested the grievance form, occurred outside of the frame. The transcript reveals that the first mention of Givens and plaintiff appearing as a pair on-screen describes Givens holding the door to the C-6 unit as the inmates returned. Then plaintiff inquired whether he had complied with every order Givens had given. Givens testified: "At first you did not. If you'll back the video up, when I first put you on the wall it will show your head turning toward me like you were going to head butt me. That's why I placed you in restraints, for my protection." The following exchange occurred:

> THE COURT: Mr. Hubbard, I'm going to be honest with you, sir. On this computer in this courtroom I can see very little if anything of this video. I'm hoping it's better for the witness and the other parties. I can see very little.
>
> Right there, Mr. Givens, do you recognize any of those individuals, or can you tell any of the individuals in the photo?
>
> THE WITNESS: It's too dark. I can't tell any of them.
>
> THE COURT: And here?
>
> THE WITNESS: I'm in the right side of the photo.
>
> THE COURT: You're doing what?

16

THE WITNESS: I'm calling Mr. Hubbard out for being disruptive. There's Mr. Hubbard stepping out.

THE COURT: It does show there's a cap on his head.

THE WITNESS: Yes, ma'am.

THE COURT: All right.

THE WITNESS: And I am facing Mr. Hubbard up against the wall so I could shake him down.

THE COURT: I can't see. It appears there's an individual facing the wall.

THE WITNESS: That's me and Mr. Hubbard. Actually, the video doesn't show it, but Mr. Hubbard, he turned on me three or four times. If you'll notice, I'm putting my legs between his to try to get in a defensive posture because I was afraid he was going to turn on me and jump on me. And we're trained to do that through the Department of Corrections.

In sum, there is no indication in the transcript that the initial encounter, when plaintiff demanded a grievance form, is captured in any meaningful way in the video footage. Nor is there any indication that the videotape shows plaintiff "walking in a streight [sic] line," as he maintains. However, the video footage does show Officer Givens – who is not a defendant in this case – taking a defensive posture. Moreover, the testimony of all the witnesses indicates that plaintiff communicated threats against Officer Serrac, which formed the basis for plaintiff's removal from the line. The evidence supports the conclusion that plaintiff was disruptive, and plaintiff's objection to this finding is overruled.

**5.**

Plaintiff objects to the finding that the video shows his head turning toward Officer Calton. Plaintiff maintains that he turned toward Officer Calton "because Officer Calton was talking to" him and, in his view, "[a] motion of plaintiff turning his head does'nt [sic] constitugte [sic] intentions of

17

headbutting Officer Calton." Plaintiff adds that "[t]he video never showed Plaintiff lunge [sic] toward Officer Calton nor any type of actions to make Calton feel threaten [sic]. . . ."

This objection must be overruled. The video is unclear as to whether plaintiff's motion could be interpreted as "lunging"; however, it does show plaintiff turning toward Calton. The undisputed context of plaintiff being escorted to the SHU is as follows: at a moment of high tension at the prison, when the prison was being placed on lockdown, plaintiff expressed his indignation over a comment made by Officer Serrac, and plaintiff stepped out of line to demand a grievance form. Given this context of disruptive conduct and the testimony of the other witnesses, it is not unreasonable to conclude that the gesture toward Officer Calton could be reasonably interpreted as a step toward "head-butting" Officer Calton. Accordingly, the objection is overruled.

**6.**

Plaintiff further challenges the magistrate judge's credibility finding, stating that Officer Serrac

> also lied during cross examination and was caught lying! Officer Serrac stated that he argued with the plaintiff for several seconds and plaintiff was being disruptive and waving his arms and hands and not standing in line . . . [sic] When plaintiff ask [sic] the judge to play the video and ask [sic] Officer Serrac to identify the plaintiff in the video as being disruptive and Officer Serrac Identified [sic] the wrong inmate three times and when he identifyed [sic] the Plaintiff the video showed the plaintiff was not being disruptive arguing [sic] at any time nor waving his arms and hands in a threatening manner therefor [sic] Officer Serrac was lying during cross examination which means he also lied under oth [sic]!

In the first instance, Officer Serrac explicitly testified that, during his encounter with plaintiff, plaintiff did not use his hands "in any way." Thus, plaintiff's contention that "Officer Serrac stated that . . . plaintiff was being disruptive and waving his arms and hands" is completely without merit.

Officer Serrac described the encounter with plaintiff as "exchanging words, more or less," and explained that he gave "the direct order for everybody to return, and stay in single file lines and

18

return to the pod, and [plaintiff] [was] the one out of the whole pod that was most disruptive, and vulgar, using profanity and making the threat." Then, when pressed to identify plaintiff on the video, he could not, testifying only that it was "possible" that a certain individual in the frame was plaintiff. Other than his tentative identification of plaintiff, there were no further identifications, much less three misidentifications. Thus, plaintiff's characterization of Officer Serrac's testimony is completely baseless.

Accordingly, plaintiff's objections to the findings concerning Officer Serrac's testimony are overruled.

7.

Plaintiff contends that Officer Porchie

> testified that Plaintiff was tooken [dic] down to the ground twice and when Plaintiff
> ask the judge to replay the video so Officer Porchie could identify on the video when
> Plaintiff was tooken [sic] down to the ground twice he couldnt [sic] identify Plaintiff
> being tooken [sic] down twice the video only show [sic] Plaintif beind [sic] thrown
> down once!

Plaintiff's own complaint states that he was taken down twice. There is no dispute in this case as to that point. Furthermore, the only segment in the video that Officer Porchie was asked to remark upon was in response to plaintiff's request on redirect examination of Officer Porchie that he identify where plaintiff "was tooken [sic] down the second time." Officer Porchie's response was that he could identify the location where the incident occurred, but he stated, "I can't make anybody out, honestly." Plaintiff's objection regarding Officer Porchie's credibility is without merit, and is overruled.

8.

Plaintiff objects to the magistrate judge's credibility finding as to Officer Calton. Plaintiff states that "Officer Calton also lied during Cross examination stating that he overheard plaintiff

19

threaten Officer Serrac!  Officer Calton didnt [sic] arrive to the incident until Plaintiff was in full restraints and the alledge [sic] threat was made while Plaintiff was standing in line!"  The testimony consistently indicates that Calton was present when plaintiff repeated his threat against Officer Serrac and the dog, not when plaintiff initially uttered the threat, and that plaintiff had been placed in restraints by that time.  Accordingly, this objection is overruled.

### 9.

Contending that "[b]oth Defendants lied under Oth [sic] during Crossexamination [sic] when asked if they made racial statements to plaintiff," plaintiff objects to the magistrate judge's credibility findings.  Other than plaintiff's own statement, there is no support for this contention.[11]  Accordingly, this objection is overruled.

### V.

Given plaintiff's objections, the court has reviewed the Magistrate Judge's Report and Recommendations de novo.  As demonstrated in the preceding review of plaintiff's objections, the

---

[11] Given that the force used against plaintiff was not excessive, a constitutional right has not been violated. Accordingly, plaintiff's bald allegation of racial animus does not implicate a constitutionally protected right.  See Thomas v. Kincaid, Civil Action No. 03-941-AM, 2004 WL 3321472 (E.D. Va. June 30, 2004) (finding that Caucasian Trooper's statement, "Come here you piece of shit," to African-American defendant was insufficient to support a claim of racial discrimination); Felton v. Chupik, Civil Action No. 00-CV-1889, 2002 WL 32344335 (E.D. Va. Aug. 21, 2002) (finding that the comment, "I think you broke that nigger's neck," was insufficient to support a claim of racial discrimination against a police officer); Collins v. Cundy, 603 F.2d 825 (10th Cir.1979) (holding that the Sheriff's actions in laughing at and threatening to hang the plaintiff were not sufficient to show the deprivation of a constitutional right).  The Constitution does not "protect against all intrusions on one's peace of mind."  Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir.1991).  Verbal harassment or idle threats to an inmate, even to an extent that causes an inmate fear or emotional anxiety, does not constitute an invasion of any identified liberty interest.  Emmons v. McLaughlin, 874 F.2d 351, 354 (6th Cir.1989) (verbal threats causing fear for plaintiff's life not an infringement of a constitutional right); Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (calling an inmate an obscene name did not violate constitutional rights); Lamar v. Steele, 698 F.2d 1286 (5th Cir. 1983) ("Threats alone are not enough.  A section 1983 claim only accrues when the threats or threatening conduct result in a constitutional deprivation."); Ellingburg v. Lucas, 518 F.2d 1196, 1197 (8th Cir. 1975) (defamation does not implicate any constitutionally protected right); Keyes v. City of Albany, 594 F. Supp. 1147 (N.D. N.Y. 1984) ("[T]he use of vile and abusive language [including racial epithets], no matter how abhorrent or reprehensible, cannot form the basis for a 1983 claim.").  The law is clear that mere "threatening language and gestures of [a] penal officer do not, even if true, constitute constitutional violations."  Fisher v. Woodson, 373 F. Supp. 970, 973 (E.D.Va.1973).

court has considered the entire record of the case, including the transcript of the testimony taken at the evidentiary hearing conducted by the magistrate judge. Given the evidence, the court concludes that the magistrate judge was correct in finding that the force used against plaintiff was not excessive. Furthermore, the court agrees with the magistrate judge as to her credibility determinations.

Based on the foregoing, the court will adopt the Magistrate Judge's Report and Recommendation, and will grant summary judgment in favor of defendants. An appropriate order will be entered this day.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to plaintiff and to counsel of record for defendants.

**ENTER**: This _30ᵗʰ_ day of June, 2008.

_____
United States District Judge

21